IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

CHRISTOPHER PERROTE,

Defendant.

OPINION AND ORDER

25-cr-130-wmc

---

A grand jury in this district returned an indictment charging defendant Christopher Perrote with two counts of unlawfully possessing ammunition as a previously convicted felon in violation of 18 U.S.C. § 922(g)(1) (Counts 1 and 3) and one count of possessing unregistered silencers in violation of 26 U.S.C. §§ 5845(a)(7) and 5861(d) (Count 2). (Dkt. #2.) Perrote has entered a conditional guilty plea to the charges against him in Count 1, subject to this court's ruling on two of his pretrial motions. (Dkt. #43, ¶ 5.)

First, Perrote has moved to suppress evidence of the ammunition and unregistered silencers found during the execution of a state search warrant issued in part based on financial and banking information disclosed to law enforcement by a credit union employee. (Dkt. #26.) Perrote argues that this information was illegally obtained and that without it the supporting application failed to establish probable cause for issuance of a valid warrant. Perrote argues further that officers exceeded the scope of the warrant during its execution, further justifying suppression of the evidence of the ammunition and silencers. In her report and recommendation entered on August 28, 2026, Magistrate Judge Anita M. Boor recommended denying the motion to suppress. ("R&R" (dkt. #52).) Perrote has filed objections. (Dkt. #53.) Pursuant to 28 U.S.C. § 636(b)(1)(C), the court

reviews a magistrate judge's report and recommendation *de novo* as to those portions to which objection is made. For the reasons explained below, the report and recommendation will be adopted and Perrote's motion to suppress is denied.

Second, Perrote moves to dismiss Counts 1 and 3 of the indictment, arguing that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him having never been convicted of a "violent felony" and, therefore, he never relinquished his Second Amendment right to keep and bear arms. (Dkt. #30.) As discussed further below, the court concludes that § 922(g)(1) is not unconstitutional as applied to Perrote, whose underlying conduct establishes his dangerousness. Accordingly, the court will deny his motion to dismiss as well.

BACKGROUND

In 2021, the State of Wisconsin charged Christopher Perrote with: (1) "Second Degree Recklessly Endangering Safety, Domestic Abuse Assessments," a Class G Felony, in violation of Wis. Stat. §§ 941.30(2), 939.50(3)(g), and 973.055(1); (2) disorderly conduct, use of a deadly weapon, with domestic abuse assessments in violation of Wis. Stat. §§ 947.01(1), 939.51(3)(b), 939.63(1)(a), and 973.055(1); and (3) computer message-threatening injury or harm, with domestic abuse assessments in violation of Wis. Stat. §§ 947.0125(2)(a), 939.51(3)(b), and 973.055(1). (*State v. Perrote*, Dane County Case No. 2021CF2187 (dkt. #46-1) 1-2.)

While intoxicated on August 10, 2021, the criminal complaint alleged that in the kitchen of their shared residence, Perrote pointed a loaded .300 Blackout AR 15 pistol at his domestic partner and threatened to kill her cat. (*Id*. at 2-3.) Perrote then pointed the

firearm at the cat itself and fired a round although missing the cat. (*Id*. at 3.) When the victim attempted to leave the house, Perrote pointed the firearm back at her, and said, "If you call the cops, I will kill you." (*Id*.) The victim then took the cat and fled to a hotel; and after Perrote found her, she continued to move to different locations. (*Id*.)

For two weeks after the shooting incident, Perrote further drove past where she was staying and texted the victim threatening messages, including one involving a mass shooting at a music festival she was planning to attend. (*Id*. at 3-4.) The victim also reported to police that Perrote was a severe alcoholic with mental health issues, who would routinely make remarks about killing her and her friends while drinking. (*Id*. at 4.) Similarly, she reported Perrote's fascination with bombs and guns, which he built and converted, possessing 40-50 in his residence; his often expressing genocidal sentiments and masturbating to depictions of violence; and his talking about killing people. (*Id*.)

After criminal charges were filed against Perrote in Case No. 2021CF2187, a state circuit court (1) separately found a "substantial risk" that Perrote may commit first degree intentional homicide or other violent crimes based on his actions toward the victim and (2) imposed a 10-year domestic abuse restraining order against him. (Injunction – Domestic Abuse, Case No. 2021CV2230 (dkt. #46-2) 2.) Perrote, who was present in court when this restraining order was entered, was also prohibited from contacting the victim, committing further acts of domestic abuse and possessing firearms until the injunction expired. (*Id*. at 2-3.)

In 2023, Perrote eventually entered a guilty plea to the original felony reckless endangerment charge with domestic abuse assessments lodged against him in Case No.

2021CF2187. (Dkt. #8, at 2.) The other counts lodged against Perrote in that case were dismissed but read into the record for purposes of punishment.[1] (*Id.*; Dkt. 46-1, at 1-2.) The court ultimately sentenced Perrote to 30 months of probation. (Dkt. #8, at 2.)

On August 19, 2024, a Summit Credit Union employee emailed a written report to Madison Police Department Detective Andrew Naylor,[2] detailing what the employee described as "concerning activity" in Perrote's account. (PERROTE_001156-57.) The report included two general categories of information. First, a series of PayPal, Venmo, and CashApp disbursements to various entities that the Summit employee believed to be "related in some part to humanitarian aid or GoFundMe campaigns related to Gaza/Palestine." (*Id.* at 001149-50.) The report documented dozens of transactions occurring from March to July 2024, totaling around $100,000. (*Id.*) The second category detailed charges to what the Summit employee noted were retail "guns/weapon companies," posted on August 10 and 13, 2024. (*Id.* at 001151-52.) The employee included these charges in the report because, in his estimation, "it is possible that [defendant Perrote] is stockpiling weapons and[,] given his previous concerns regarding mass killing events or bomb[ing a] building, it is possible he is planning on attempting a mass killing event, or a form of domestic terrorism." (*Id.*) The employee apparently drew

---

[1] Under Wisconsin law, if a charge is "dismissed but read in," the defendant is not convicted of the offense, but the circuit court can consider the allegations underlying that charge when imposing sentence. *See State v. Straszkowski*, 2008 WI 65, ¶ 93, 310 Wis. 2d 259, 750 N.W.2d 835.

[2] According to the search warrant affidavit, Detective Naylor worked for the City of Madison Police Department and assigned to the FBI's Joint Terrorism Task Force; he was also on the MPD's Threat Assessment Team "with a primary investigative focus on domestic and foreign terrorism and threat assessment as it relates to the prevention of mass violence events." (Dkt. #33-2, at 14.)

these conclusions after finding a local news article reporting that: Perrote's home had been raided by federal agents following his arrest in 2021; a stockpile of firearms and other weapons was discovered; and Perrote had made threats about mass killing and building bombs. (*Id*. at 001149.)

In response to this volunteered information, investigators next contacted Perrote's supervising probation agent through the Wisconsin Department of Corrections, obtaining his address, telephone number, and rules of supervision. (PSR (dkt. #54) ¶ 11.) Among other things, they also learned that Perrote had not obtained permission from his supervising probation agent to purchase any firearms or ammunition as required by the terms and conditions of his supervised release. (*Id*.) On August 22, 2024, WDOC issued a warrant for Perrote's arrest for a probation violation. (*Id*.)

Four days later, on August 26, Detective Naylor applied for a warrant in Wisconsin state circuit court to search Perrote's residence in Madison, Wisconsin, based on the information that the Summit employee provided. (Dkt. #33-2, at 8-19.) In particular, Detective Naylor included the information that Summit provided about defendant's recent banking activity, concluding as follows:

> Based upon Perrote's previous weapons offense and possession of numerous firearms and firearm parts in 2021; and the recent transactions from Perrote's Summit Credit Union account to firearm parts retailers, your affiant believes that Perrote is in possession of firearms parts that he intends to assemble into working firearms. Your affiant is also aware that a felony conviction restricts an individual from purchasing firearms at dealers who require background checks.

(*Id*. at 16.) In his supporting affidavit, Detective Naylor also included details of the 2021 incident in which Perrote aimed a loaded firearm at his then-domestic partner and fired it

in the direction of her cat, which led to his state court felony conviction for recklessly endangering safety with domestic abuse assessments. (*Id*. at 14-15.)

The proposed warrant itself sought evidence related to firearms, firearm-related articles, and other weapons, as well as "printed or digital diaries, journals, manifestos or representations containing anti-government, anti-authority, or any cross-programmic or violent extremist ideologies." (*Id*. at 11.) A Dane County circuit court judge signed a search warrant the same day it was presented after excising several authorizations sought by Detective Naylor, including evidence of printed and digital materials indicating anti-government or extremist ideologies. (*Id*. at 5.)

On August 27, 2024, Perrote was arrested on the probation-violation warrant at his residence, while officers seized multiple firearms, firearms parts, and ammunition pursuant to the separate search warrant. (Dkt. #33, at 6.) Officers also photographed certain posters, flags, clothing, books, and notes, at least some of which related to the conflict in Gaza between Palestine and Israel. (Dkt. #50, at 18.)

On December 3, 2024, Perrote's probation in Dane County Case No. 2021CF2187 was revoked and he was sentenced to 16 months in prison, followed by extended supervision for a term of 3 years and 8 months. (Dkt. #8.) In November 2025, investigators also obtained and executed another search warrant for a storage unit belonging to Perrote, seizing an additional cache of firearms, firearm parts, firearm accessories, and ammunition. (PSR (dkt. #54) ¶ 18.) During a random search of his cell at the Dane County Jail, Perrote's journal was further seized, which disclosed plans to kill the state prosecutor in Case No. 2021CF2187 and their family, flee the country, and live

"proudly in exile as a terrorist sympathizer and supporter who refused to stand by and do nothing in the face of genocide," among other concerning remarks about his intention to continue manufacturing firearms so he can "burn the state to the ground" as part of a plan called "Operation Exodus." (*Id*. at ¶¶ 19-24.)

On December 10, 2025, Perrote was indicted by a grand jury in the Western District of Wisconsin on three federal firearms counts as a felon in possession of ammunition and unregistered firearm silencers. (Dkt. #2.) Perrote is also currently facing additional felony charges in Dane County Case No. 2024CF2383, where he is charged with multiple counts of possessing body armor as a "convicted violent felon" and multiple counts of possessing firearms as a previously convicted felon. (Dkt. #8, at 4.)

OPINION

## I. Motion to Suppress

Defendant moved to suppress evidence seized from his residence pursuant to a search warrant on August 27, 2024, under the following theories: (1) the warrant contained financial information that was disclosed illegally by Summit in violation of the Right to Financial Privacy Act ("RFPA"); (2) the affidavit in support of the warrant did not otherwise establish probable cause; and (3) the manner of the warrant's execution exceeded the scope of the warrant and rendered the search and its fruits unreasonable. (Dkts. #26, #33.) Magistrate Judge Boor rejected each theory and recommended denying the motion to dismiss. (Dkt. #52.) Defendant's remaining objections to her R&R are addressed below.

**A. RFPA**

Defendant argues that Summit violated the RFPA by disclosing a four-page report and a two-page spreadsheet listing nearly five months of his financial transactions. The RFPA prohibits financial institutions, their officers, employees, and agents from providing government authorities access to or copies of any customer's financial records. 12 U.S.C. § 3403(a). Magistrate Judge Boor found the defendant failed to show his financial information was disclosed improperly because the records Summit turned over fell within a recognized exception under the RFPA, which expressly permits a financial institution and its officers, employees, or agents to notify government authorities if the institution has information that may be relevant to a possible statutory or regulatory violation. 12 U.S.C. at § 3403(c). in particular, this exception specifies that "[s]uch information may include only the name or other identifying information concerning any individual . . . and the nature of any suspected illegal activity." *Id*.

As Judge Boor observed in her R&R, the Seventh Circuit has also found no violation of the RFPA in a civil case challenging a bank's disclosure of suspicious deposit and wire transfer records to federal investigators. (Dkt. #52, at 5 (citing *Toader v. J.P. Morgan Chase Bank*, 482 F. App'x 180 (7th Cir. 2012)). In *Toader*, the bank disclosed to law enforcement seven months' worth of the plaintiff's deposit and wire transfer slips, which showed the plaintiff had deposited cash, then transferred more than $350,000 to Cyprus and Romania, which triggered an investigation of the plaintiff's accounts and led it to conclude his activities suggested "potential criminal activity that was sufficiently suspicious to require notifying law enforcement." *Id*. Toader later pleaded guilty to wire fraud, then sued the

bank for violating the RFPA. The district court granted summary judgment in the bank's favor and the Seventh Circuit affirmed, concluding that the bank's disclosure was permitted by § 3403(c) because it "contained only information about transactions that the bank suspected were illegal[.]" *Id*. at 182 (citing *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005)).

As in *Toader*, the written report provided to Detective Naylor by a Summit employee described the nature of "suspected illegal activity" in connection with defendant's recent purchases from weapons dealers. (PERROTE_0001149-001152.) Specifically, the employee listed several transactions with weapons dealers that raised concerns given the news report of a previous raid of defendant's home following a domestic violence incident in 2021, as well as suspicions that defendant may be stockpiling weapons and planning a mass killing event or another form of domestic terrorism. (*Id*. at 001151-001152.) Judge Boor also found the holding in *Toader* consistent with precedent from other circuits and other district courts within the Seventh Circuit. (Dkt. #52, at 6-7.) As such, this court adopts Judge Boor's holding that Summit's disclosure was permissible under § 3403(c) and overrules defendant's objection to the contrary.

Judge Boor also held that any violation of the RFPA did not warrant suppression, adopting the prevailing view that no Fourth Amendment remedies are available to criminal defendants whose charges stem from information disclosed under § 3403(c), even if that provision was violated. (Dkt. #52, at 8 (citing *United States v. Davis*, 953 F.2d 1482, 1496 (10th Cir. 1992) ("Moreover, even had the RFPA been violated, we agree with the district court that suppression is not an available remedy."); *United States v. Van Engel*, No. 91-CR-

5, 1992 WL 477645, at *13 (E.D. Wis. Feb. 6, 1992) ("[RFPA] provides for only money damages as a post-violation remedy"); *United States v. Wigginton*, No. 6:15-CR-5-GFVT-HAI-1, 2015 WL 8527606, at *5 (E.D. Ky. Oct. 28, 2015), *objections overruled*, No. 6:15-CR-5-GFVT-HAI-1, 2015 WL 8492457 (E.D. Ky. Dec. 10, 2015) ("[T]he remedies listed in 12 U.S.C. § 3417(a) are the exclusive remedies against the government for a violation of the RFPA, and thus it does not authorize a court to suppress or exclude evidence.") (collecting cases); *United States v. Whitty*, 688 F. Supp. 48, 59 (D. Me. 1988) ("Because any privacy interest Whitty III had in the financial records disclosed by BFCU was protected only by statute, any remedy for the invasion of that privacy interest derives from the RFPA, not from the fourth amendment.").) Defendant does not attempt to distinguish any of the authority identified by Judge Boor in support of her well-reasoned conclusion. Accordingly, his objection to this portion of the R&R is also overruled.

**B. Probable Cause**

Defendant separately contends that the fruits of the August 27 search should be suppressed because the warrant application lacked probable cause. Specifically, defendant argues that: (1) information in the application from the 2021 domestic abuse incident was stale and constituted unreliable hearsay; (2) bank transactions showing recent weapons purchases do not by themselves create probable cause; and (3) whatever probable cause may have existed was predicated on the omission of a material fact. Although Judge Boor rejected each argument, defendant objects only to her conclusions about arguments (1) and (3), each of which the court addresses below before adopting Judge Boor's finding that

the warrant application provided adequate probable cause to support issuance of the search warrant.

**1. 2021 Weapon Offense Involving Domestic Violence**

Detective Naylor completed an affidavit in support of a search warrant for defendant's residence, seeking evidence that defendant was a felon in possession of firearms in violation of Wis. Stat. § 941.29(1m)(a). (Dkt. #33-2, at 7.) Naylor's affidavit commenced with several paragraphs detailing defendant's arrest and conviction for second degree felony recklessly endangering safety during an incident of domestic violence in 2021, which specifically involved a loaded .300 Blackout AR 15 pistol at his domestic partner, threatening and then shooting at her cat as it walked through the kitchen. (*Id*. at 14.) Naylor also included text messages that defendant sent to the victim following this incident, threatening mass violence at a music festival "to get attention," and the victim's comments to an investigating officer about defendant's substantial collection of firearms "inside his residence." (*Id*. at 14-15.)

Defendant intially argues that information given by the victim in 2021 does not support probable cause for the search conducted on August 27, 2024, because it was both uncorroborated and stale. While the victim's report was not overly detailed, Judge Boor found her status as the defendant's domestic partner enhanced reliability, rejecting defendant's attempt to characterize her instead as an "unidentified informant." (Dkt. #52, at 10.) Contrary to defendant's argument, Judge Boor noted further noted that the victim's account was corroborated after a search of defendant's home following his arrest, which revealed copious firearms, other weapons, munitions, and related items, including the

specific firearm identified by the victim as having been pointed at her before firing a shot at her cat (the .300 Blackout AR 15 pistol). (*Id.*)

Defendant's related contention about the staleness of the victim's account about the 2021 weapons offense is likewise unpersuasive for reasons articulated by Judge Boor. Indeed, the victim's 2021 report to police described defendant's "longitudinal obsession with homicidal violence, weapons, and genocide." (*Id.* at 10-11.) As Judge Boor observed, the Seventh Circuit also has found years-old information to be relevant to the probable cause determination when there is reason to believe that circumstances have not changed substantially since the information was given. (*Id.* at 11 (citing *United States v. Carroll*, 750 F.3d 700, 704-05 (7th Cir. 2014) ("under certain circumstances years can pass between information about child pornography offenses and applications for search warrants without rendering the information stale").) Moreover, the power of that evidence is underscored by the subsequent, 10-year prohibition on defendant possessing any firearm in the domestic abuse injunction order in Dane County Circuit Case No. 2021CV2230 and separate prohibition of possession of any firearm during his 30-month probationary period beginning in 2023 in criminal Case No. 202CF2187. Given the similarity of the circumstances in 2021 and 2024, the victim's corroborated account of defendant's tendency to hoard weaponry inside his home, and these state prohibitions, the court agrees that the victim's statements to law enforcement are certainly not so stale as to render the supporting affidavit infirm.

Finally, the court similarly rejects defendant's argument that his 2023 felony conviction stemming from the domestic violence incident in 2021 is not probative of

whether he was violating the law by possessing firearms in 2024. As Judge Boor noted, the 2023 felony conviction is relevant to provide a requisite element of a felon-in-possession charge *and* was bolstered in this instance with information that Detective Naylor included about the bank transactions from Summit showing the defendant had made multiple purchases from online retailers of firearms and firearm parts while on supervised release from a prior felony conviction. (Dkt. #33-2, at 15-16.) Accordingly, defendant's objections based on the victim's description of his conduct in 2021 are overruled.

**2. Material Omission**

Defendant argued that evidence seized from his home on August 27 should be suppressed because Detective Naylor omitted a piece of material information provided by the Summit employee about defendant's transactions. Specifically, the Summit employee who investigated defendant's suspicious transactions observed that he logged into his Summit account twice on June 11, 2024, using IP addresses that were in two different states, one of which was in Raleigh, North Carolina, while the other corresponded with Denver, Colorado. (PERROTE_001151.) Given that defendant was residing in Madison, Wisconsin, the Summit employee speculated that defendant may have been "using a VPN to attempt to obscure or encrypt his web transactions." (*Id.*) While Detective Naylor included much of the other information Summit disclosed, he omitted information about the use of different IP addresses on June 11 from the search warrant application.

Judge Boor rejected defendant's arguments, finding the omission was immaterial. (Dkt. #52, at 14-15.) Nevertheless, defendant objects that mention of the IP addresses from other states is relevant because it raises a question about whether his Summit account

was accessed from somewhere other than his home at the time, defendant essentially arguing that the use of IP addresses in two different states on the same day tends to negate any link between the suspected crime and the proposed location in Wisconsin to be searched, despite it being his undisputed residence at the time. (Dkt. #53, at 13-14.) On this point, Judge Boor found that the use of two IP addresses to log into defendant's Summit account on a single day in June 2024, predates by several weeks his purchases from online weapons retailers in August 2024, which were referenced in Detective Naylor's affidavit. Even if the omitted information about the use of two IP addresses had been included, moreover, it would not have negated other information supplied by Summit and included in the affidavit to show that defendant purchased firearms or firearm parts from online retailers weeks later in August.

Accordingly, defendant offers nothing persuasive to show any material falsity or omission that would alter the probable cause determination based on the likelihood that he shipped his online purchases to his home, as people commonly do, much less demonstrating that the omission was done with a deliberate or reckless disregard for the truth. *United States v. McMurtrey*, 704 F.3d 502, 508 (7th Cir. 2013) (discussing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)). Therefore, defendant's objections to the search warrant affidavit are overruled as well.

### C. Scope of the Warrant

Finally, defendant argues that the fruits of the August 27 search of his home must be suppressed because the officers' execution of the warrant exceeded the scope permitted by the state circuit court judge who approved it. (Dkt. #33, at 15.) Specifically, defendant

argues that the circuit court judge who approved the warrant struck portions that would have authorized the seizure of "any printed or digital diaries, journals, manifestos or representations containing anti-government, anti-authority, or any cross-programmatic or violent extremist ideologies," among other materials associated with political dissent. (Dkt. #33-2, at 5-6; PERROTE_001182-001188.) Nevertheless, officers took photographs of various articles in defendant's home, depicting, pertaining to, or associated with the conflict between Israel and Palestine in Gaza -- such as flags, books, and stickers, expressing the kind of political writings and symbols expressly excised from the warrant by the state circuit court.

However, Judge Boor concluded, and this court agrees, that even if taking these photographs exceeded the scope of the search warrant, they are severable from the seized ammunition and firearm silencers at issue in this case. (Dkt. #52, at 15.) Indeed, there is *no* suggestion that by taking photographs of political writings and symbols found in defendant's home, the officers abandoned their search for evidence that he unlawfully possessed firearms, firearm parts, and ammunition as a previously convicted felon given that the warrant specifically authorizing them to do so. Again, as Judge Boor correctly held, "[t]he seizure of uncontested evidence remains valid and is 'severable from any invalid search' so long as the warrant itself was not so vague as to be an impermissible 'general warrant.'" (*Id*. (quoting *United States v. Buckley*, 4 F.3d 552, 558 (7th Cir. 1993) (citing *United States v. Klebig*, 228 F. App'x 613, 619 (7th Cir. 2007) ("even though the officers exceeded the scope of the warrant and improperly seized some evidence, that does not make the evidence of the illegal rifle and silencer, which were legally seized,

inadmissible")).) Accordingly, defendant's objections based on the scope of the warrant are overruled.

Defendant having failed to raise a valid objection to Judge Boor's R&R, the court will adopt it and will deny his motion to suppress.

## II. Motion to Dismiss

In addition to his suppression motion, defendant moves to dismiss Counts 1 and 3 of the indictment, charging him with unlawful possession of ammunition following a felony conviction in violation of 18 U.S.C. § 922(g)(1). As part of the federal Gun Control Act, § 922(g)(1) makes it a crime for any person who has been convicted in any court of "a crime punishable by imprisonment for a term exceeding one year" to possess a firearm or ammunition in or affecting interstate commerce. Defendant argues that § 922(g)(1) is unconstitutional because it violates "the right of the people to keep and bear Arms" under the Second Amendment. U.S. Const. amend. II. Specifically, defendant argues that § 922(g)(1) is unconstitutional as applied to him because his predicate felony did not involve a "violent" offense.

### A. The *Bruen* Framework

While the Second Amendment confers an individual right to possess and carry firearms, the U.S. Supreme Court has held that this right is not unlimited. *District of Columbia v. Heller*, 554 U.S. 570, 592, 626 (2008). In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court further established a two-step

framework for analyzing Second Amendment challenges to regulations restricting possession of firearms based on textual analysis and historical evidence.

Under the *Bruen* framework, a court must first consider whether the law before it clashes with the "plain text" of the Second Amendment. *Id*. If a challenged law falls within the plain text of the Second Amendment, it is presumptively unconstitutional, *id*., "which means that it *may* violate the preexisting right that the Amendment codified." *Wolford v. Lopez*, 609 U.S. 185, 196 (2026) (emphasis in original). To determine whether it does, however, a court must then consider *Bruen's* second step, which requires the government to provide historical analogues to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. In undertaking this inquiry, the court must assess whether the challenged regulation is "relevantly similar" to historical laws regulating firearms *and* "apply[ ] faithfully the balance struck by the founding generation to modern circumstances." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). Moreover, the "why and how" of the regulation's burdens are central to this inquiry, because the historical analogues must resemble the challenged law both in purpose and in operation. *See United States v. Hemani*, 608 U.S. 772, 780 (2026). At the same time, the historical analogues "need not be a 'dead ringer' or a 'historical twin.'" *Rahimi*, 602 U.S. at 692 (quoting Bruen, 597 U.S. at 30). Even where a modern firearm regulation "does not precisely match its historical precursors," it may still be sufficiently analogous to satisfy the Second Amendment if it comports with "*principles* that underpin our regulatory tradition." *Id*. (emphasis added).

Here, it is not disputed that § 922(g)(1)'s felon-in-possession prohibition falls

within the Second Amendment's plain text for purposes of *Bruen's* first step. In particular, the Seventh Circuit recently held that "the people" who possess the right to bear arms under the plain terms of the Second Amendment "includes felons." *United States v. Watson*, 171 F.4th 1012, 1017-18 (7th Cir. 2026), *cert denied*, 2026 WL 2976245 (Oct. 5, 2026). Accordingly, the court must address *Bruen's* second step by considering whether § 922(g)(1) is supported by historical principles for regulating possession of firearms.

To begin, all circuit courts to have addressed the question after *Bruen*, including the Seventh Circuit, agree that § 922(g)(1) is "valid in many applications and cannot be declared unconstitutional 'on its face.'" *United States v. Prince*, 171 F.4th 1009, 1011 (7th Cir. 2026), *cert. denied*, 2026 WL 2976970 (Oct. 5, 2026). Moreover, the Seventh Circuit has rejected as-applied challenges to § 922(g)(1) by defendants whose predicate felonies are considered "dangerous," *Watson*, 171 F.4th at 1024-25 (possession with intent to distribute cocaine), or qualify as violent, *Prince*, 171 F.4th at 1011 (armed robbery and aggravated battery). However, the Seventh Circuit reserved ruling on an as-applied challenge to § 922(g)(1) under the Second Amendment "by persons whose felony convictions do not suggest that firearms would be dangerous in their hands." *Prince*, 171 F.4th at 1011-12.[3] Defendant argues that he fits within that class of non-violent felons.

The government responds that § 922(g)(1) is constitutional as applied categorically to all convicted felons, whether their predicate conviction was violent or non-violent. (Dkt.

---

[3] According to the government, this issue is pending before the Seventh Circuit again in *United States v. Thompson*, No. 24-2904 (7th Cir.), which had oral argument on September 17, 2026, but has not been decided.

#46, at 9.) In support, the government points to *Watson*, in which the Seventh Circuit held that legislatures may permissibly "determine that classes of people are dangerous" and impose "categorical restrictions" or "class-wide bans" on their possession of firearms even where their underlying conduct was not violent. 171 F.4th at 1021-22; *see also Kanter v. Barr*, 919 F.3d 437, 456, 469 (7th Cir. 2019) (Barrett, J., dissenting) (observing that the historical record demonstrates that legislatures could disarm categories of persons based on "threatened violence" or a "propensity for dangerous behavior"). For example, the government notes that during the American Revolution, the Continental Congress recommended, and most states, enacted, laws disarming loyalists and others who refused to swear allegiance to the new Republic. (Dkt. #46, at 10 & n.4.)[4] The government presents additional historical examples of punishment for certain crimes with forfeiture of firearms. (Dkt. #46, at 16.)[5]

---

[4] The government cites, in particular: 4 *Journals of the Continental Congress* 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776); Act of Sept. 20, 1777, ch 40, § 20, *Acts of the General Assembly of the State of New-Jersey* 90 (1777), ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Walter Clark ed., 1905); Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 480 (1886); Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801,* -561 (1902); Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell Bartlett ed., 1862); Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All the Lawes of Virginia, from the First Session of the Legislature in the Year 1619*, 282 (William Waller Hening ed., 1821).

[5] For example, the government points out that a New York law provided that a person would "be disarmed" upon conviction for furnishing provisions to the British army or for opposing the authority of the Continental Congress. Resolutions of Sept. 1, 1775, in 1 *Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of Safety of the State of New-York* 132 (1842). A South Carolina law provided that a person would "be disarmed" upon "due conviction" for bearing arms against, or opposing the measures of, the Continental Congress. Resolution of Mar. 13, 1776, in *Journal of the Provincial Congress of South Carolina*, 1776, 77 (1776). Additionally, a Connecticut law provided that anyone "duly convicted" of seditious libel "shall be disarmed and not allowed to have or keep any arms." Act of Dec. 1775, in *The Public Records of the Colony of Connecticut From May, 1775 to June 1776*, inclusive 193 (Charles J. Hoadly ed., 1890).

The government offers further historical evidence that laws went much further than § 922(g)(1) by authorizing capital punishment and estate forfeiture for felons, including those convicted of an array of non-violent offenses. (Dkt. #46, at 14.)[6] The government cites several other examples of severe penalties short of death in our history, but at least as serious as disarmament, for counterfeiting and forgery. (*Id*. at 15 & n.5.)[7] The government reasons that if historical legislatures could authorize such severe and permanent punishment for offenses not limited to violent felonies, then the "lesser restriction" of disarmament under § 922(g)(1) is permissible.

Finally, the government notes that disarmament based on felon status is not necessarily permanent, and is therefore constitutional as applied to all felons, because Congress provided a way for felons to seek relief from the prohibition on firearms possession found in § 922(g)(1). Specifically, under 18 U.S.C. § 925(c), a person with a

[6] In England, death was an authorized punishment for serious types of larceny, such as horse-stealing, stealing sheep or cattle, taking cloth from the place of manufacture, plundering shipwrecks, and stealing letters sent by post. (Dkt. #46, at 14)(citing 4 William Blackstone, *Commentaries on the Laws of England* 239 (1769)). In America, several colonies and states authorized the death penalty for counterfeiting and forgery. (*Id*. at 14-15) (citing Act of Feb. 7, 1788, ch. 20, 1788 N.Y. Laws 632; Act of Mar. 5, 1737, No. 650, § 3, 1737 S.C. Laws 147; Act of 1743, Acts and Laws of the English Colony of Rhode Island and Providence-Plantations in New-England in America 33-34 (1767)).

[7] Those examples include: Act of May 1777, ch.11, 9 *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, 302-03 (William Waller Hening ed., 1821) (offender "shall forfeit his whole estate," receive "thirty nine lashes," and "serve on board some armed vessel in the service of this commonwealth, without wages, for a term not exceeding seven years"); Act of Dec. 24, 1771, 1771 N.H. Laws 565-66 (offender "shall be set on the Pillory in some open place, and there have one of his Ears cut off, and also shall have and suffer Imprisonment by the space of one whole Year"); Act of Feb. 8, 1783, ch. 46, 1783 Del. Laws 773 (offender "shall be whipped at the public whipping-post of the county on his or her bare back with thirty-nine lashes well laid on, and be set in the pillory for one hour, and have the soft parts of his or her ears cut off").

felony conviction may apply to the Attorney General for relief from federal firearm disarmament if the applicant shows he "will not be likely to act in a manner dangerous to public safety" and "the granting of the relief would not be contrary to the public interest." *Id*. While this procedure was effectively disabled after Congress barred the Bureau of Alcohol, Tobacco, Firearms, and Explosives from using funds to evaluate applications, *United States v. Bean*, 537 U.S. 71, 74 (2002), the current U.S. Attorney General has rescinded the delegation of authority to the ATF and has begun to restart the § 925(c) process. *Withdrawing the Attorney General's Delegation of Authority*, 90 Fed. Reg. 13080 (Mar. 20, 2025). In fact, the Attorney General has already granted relief under § 925(c) to at least 32 individuals. (Dkt. #46, at 19 (citing *Granting of Relief; Federal Firearms Privileges*, 90 Fed. Reg. 17,835 (Apr. 9, 2025; 91 Fed. Reg. 8,532 (Feb. 23, 2026)).

While the Seventh Circuit has not yet ruled on whether § 922(g)(1)'s categorical prohibition on firearms possession by non-violent felons complies with the Second Amendment following *Bruen*, six other circuits have sided with the government's argument in favor of a categorical ban and have concluded that the Nation's historical tradition of firearm regulation supports disarming all individuals convicted of a felony without making a distinction between violent and non-violent predicate offenses. *See United States v. Jackson*, 110 F.4th 1120, 1125-26 (8th Cir. 2024) (concluding that "there is no need for felony-by-felony litigation" because, as applied to all "convicted felons," § 922(g)(1) "is consistent with the Nation's historical tradition of firearm regulation"), *cert. denied*, 149 S. Ct. 2708 (2025); *United States v. Hunt*, 123 F.4th 697, 707 (4th Cir. 2024) ("Just as early legislatures retained the discretion to disarm categories of people because they refused to

adhere to legal norms in the pre-colonial and colonial era, today's legislatures may disarm people who have been convicted of conduct the legislature considers serious enough to render it a felony."), *cert. denied*, 145 S. Ct. 2756 (2025); *United States v. Warner*, 131 F.4th 1137, 1148 (10th Cir. 2025) (holding that § 922(g)(1) is constitutional as applied to non-violent felons and citing *Vincent v. Bondi*, 127 F.4th 1263, 1265 (10th Cir. 2025), *cert. denied*, 146 S. Ct. 1768 (2026)); *United States v. Duarte*, 137 F.4th 743, 761 (9th Cir. 2025) (en banc) ("our historical tradition of categorically disarming those whom the legislature determines to represent a 'special danger of misuse' also supports the application of § 922(g)(1) to felons, [even those] who assert that their felonies were non-violent"), *cert. denied*, 2026 WL 135692 (Jan. 20, 2026); *United States v. Dubois*, 139 F.4th 887, 893 (11th Cir. 2025) (upholding § 922(g)(1) while emphasizing that, consistent with prior precedent, "felons are categorically 'disqualified from exercising their Second Amendment right under *Heller*"), *cert. denied*, 2026 WL 135685 (Jan. 20, 2026); *Zherka v. Bondi*, 140 F.4th 68, 96 (2d Cir. 2025) (rejecting the contention that § 922(g)(1) "violates the Second Amendment as applied to 'nonviolent' felons"), *cert. denied*, 2026 WL 135708 (Jan. 20, 2026).

Even so, there is a circuit split with the Third and Fifth Circuits upholding as-applied challenges to § 922(g)(1) for non-violent offenses that do not suggest a risk of future dangerousness. *See Range v. Attorney General*, 124 F.4th 218, 222-23 (3d Cir. 2024) (en banc) (involving a defendant convicted of making a false statement on an application for food stamps); *United States v. Cockerham*, 162 F.4th 500 (5th Cir. 2025) (involving a defendant convicted of a felony for non-payment of child support), *cert. denied*, 146 S. Ct. 2705 (2026). However, these cases are readily distinguishable from defendant's predicate

offense, which is not remotely comparable to the non-violent offenses in *Range* or *Cockerham* and, in fact, supports a finding that disarmament under § 922(g)(1) is not unconstitutional as applied to him for the reasons discussed further below.

**B. Defendant's Dangerousness**

Even without considering the validity of a categorical ban on firearms possession, the government argues that defendant's as-applied challenge also fails because his underlying criminal history and conduct show him *to be dangerous*. In particular, after considering both the historical disarmament of groups that state legislatures deemed dangerous and the historical penalties imposed on felons (typically, the death penalty, which necessarily included the "lesser restriction" of disarmament), the Seventh Circuit held in *Watson* that "these traditions support [constitutionally] disarming those with dangerous felonies." 171 F.4th at 1020 (citation omitted). Applying this guiding principle, the *Watson* court then asked whether the defendant's *specific* predicate felony was dangerous enough to support constitutional disarmament, holding that Watson's federal drug conviction *was* "sufficient to lawfully disarm him," because "drugs and guns together are dangerous." *Id*. at 1023. Finally, in reaching this conclusion, the Seventh Circuit considered common law interpretations of the crime of conviction, statutory penalties for drug crimes involving firearms, the U.S. Sentencing Guidelines, and whether "common sense" supports finding the predicate felony to be a "dangerous" crime. *Id.* (quoting *Rahimi*, 602 U.S. at 698); *see also United States v. Roberson*, No. 25-cr-133-jdp, 2026 WL 2455088, at *3 (W.D. Wis. Aug. 21, 2026) (holding that a defendant with a non-violent felony was

subject to disarmament after considering misdemeanor convictions for discharging a firearm near a building, which showed him to be dangerous).

This court easily concludes that defendant's predicate felony and relevant conduct qualifies as dangerous under this standard. As explained above, defendant was convicted of second degree recklessly endangering safety in violation of Wis. Stat. § 941.30(2), which provides that "[w]hoever recklessly endangers another's safety is guilty of a Class G felony." A Class G felony is punishable by "a fine not to exceed $25,000 and imprisonment not to exceed 10 years, or both." Wis. Stat. § 939.50(3)(g). The offense of conviction also had a modifier for domestic abuse under Wis. Stat. § 973.055(1), which is defined to include "any of the following engaged in by an adult person against his or her spouse or former spouse, against an adult with whom the person resides or formerly resided or against an adult with whom the person has a child in common":

> 1. Intentional infliction of physical pain, physical injury or illness.
> 2. Intentional impairment of physical condition.
> 3. A violation of s. 940.225(1), (2) or (3) [involving sexual assault].
> 4. A physical act that may cause the other person reasonably to fear imminent engagement in the conduct described under subd. 1, 2 or 3.

Wis. Stat. § 968.075(1)(a).

As a result, defendant had to pay a surcharge intended to fund services for victims of domestic violence. Wis. Stat. § 973.055(1), (3). In particular, the criminal complaint for the charged offense confirms that the victim was in a domestic relationship with defendant, who pointed a loaded firearm at her before firing a round at her cat, then

threatened: "If you call the cops, I will kill you." (Dkt. #46-1, at 3.) Thus, the facts alleged, which are undisputed by defendant, paint him as violent, dangerous and pathologically controlling.

Because of his threatening behavior, defendant is also subject to a domestic abuse restraining order, in which the state circuit court found that there was a "substantial risk" that defendant may commit first degree intentional homicide, as well as other violent offenses. (Dkt. #46-2, at 2.) A domestic abuse restraining order of the kind lodged against defendant demonstrates a heightened risk of danger. *See Rahimi*, 602 U.S. at 690 (holding that that the prohibition on firearms possession for individuals subject to a domestic abuse restraining order in 18 U.S.C. § 922(g)(8) is constitutional because such orders contain findings of "a credible threat to the physical safety of an intimate partner").[8]

Consistent with *Rahimi*, the Seventh Circuit has rejected an as-applied challenge for a defendant based on a record reflecting dangerousness sufficient to warrant disarmament. *Watson*, 171 F.3d at 1023 (holding that "individuals convicted of dangerous felonies pose a risk to society and may be disarmed consistent with the Second Amendment"). Similarly, this court considers the facts of defendant's underlying predicate felony reasonably determinative in finding that his conviction shows him to be a person who is sufficiently dangerous to warrant disarmament consistent with the Second Amendment. *See id.*; *see*

[8] While defendant was not charged with violating § 922(g)(8), the government argues that the dangers associated with those who are subject to these types of restraining orders going armed are relevant to this court's determination whether defendant is a dangerous felon who can be constitutionally disarmed under § 922(g)(1). The court agrees that defendant's entire record is relevant to whether he is dangerous and can be disarmed consistent with the Second Amendment. *Roberson*, No. 25-cr-133-jdp, 2026 WL 2455088, at *3.

*also United States v. Hilliard*, 839 F. Supp. 3d 710, 715 (N.D. Ind. Apr. 20, 2026) ("Crimes that are 'not strictly crimes against the person' may nevertheless be considered dangerous if they 'pose a significant threat of danger.'") (citing *United States v. Williams*, 113 F.4th 637, 659 (6th Cir. 2024)).

Moreover, defendant committed the instant firearms violations while on probation from his underlying felony offense, which was then revoked due to his possession of weaponry, and further serves to doom his as-applied challenge. *See United States v. Vining*, No. 3:26cr6, 2026 WL 2149966, at * 4 (N.D. Ind. June 18, 2026) (noting that "'violating the terms of one's release by possessing arms while on parole' would 'doom a defendant's as-applied challenge [to § 922(g)(1)]'") (quoting *United States v. Hembree*, 165 F.4th 909, 913 (5th Cir. 2026), *cert. denied*, 2026 WL 2976154 (Oct. 5, 2026)); *see also United States v. Quailes*, 126 F.4th 215,224 (3rd Cir. 2025) (concluding that § 922(g)(1) is constitutional as applied to felons on parole or probation and that disarming them is consistent with "principles underlying the Second Amendment"), *cert. denied*, 146 S. Ct. 127 (2025); *United States v. Gigilio*, 126 F.4th 1039, 1044 (5th Cir. 2025) (upholding a § 922(g)(1) conviction where the defendant was found armed while still serving his sentence on supervised release because, historically, "convicts could be required to forfeit their weapons and were prevented from reacquiring arms until they had finished serving their sentences") (citing *United States v. Moore*, 111 F.4th 266, 271 (3rd Cir. 2024), *cert. denied*, 145 S. Ct. 2849 (2025), and *United States v. Goins*, 118 F.4th 794, 801-02 (6th Cir. 2024)); *accord United States v. Gay*, 98 F.4th 843, 847 (7th Cir. 2024) (rejecting an as-applied challenge to § 922(g)(1) whose underlying offenses showed he was not law abiding and had violated

the conditions of his release on parole, noting that "parolees lack the same armament rights as free persons").

For all of these reasons, the court will deny defendant's motion to dismiss.

ORDER

IT IS ORDERED that:

1) The Report and Recommendation dated August 28, 2026 (dkt. #52) is ADOPTED.
2) Defendant Christopher Perrote's motion to suppress evidence (dkt. #26) is DENIED.
3) Defendant's motion to dismiss Counts 1 and 3 of the indictment (dkt. #30) is also DENIED.

Entered this 15th day of October, 2026.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge